1-815-14, Commonwealth of Massachusetts v. Department of Health & Human Services at All. Ms. Corley, good morning. Good morning, your honors, and may it please the Court, Assistant Attorney General Julie Kobik for the Commonwealth, with me is Assistant Attorney General John Burke. With the Court's permission, I'd like to reserve two minutes for rebuttal. You may. Thank you. The Commonwealth invoked the jurisdiction of the Federal Court in this case to challenge rules that will imminently harm the health and well-being of Massachusetts residents and impose direct financial costs on the Commonwealth. In the District Court, the Commonwealth introduced extensive evidence demonstrating a substantial risk of injury from those rules, which authorized employers to stop providing the contraceptive coverage guaranteed by the Affordable Care Act to their female employees and their employees' dependents. But the Federal Departments don't even acknowledge that a substantial risk of injury is sufficient to satisfy the imminence component of Article III standing. Instead, they, like the District Court, insist on evidence that injury is certain to occur. That's the wrong standard under this Court's precedence, and this Court should reverse the judgment of the District Court. Now, I'd like to begin with the Commonwealth's economic injury and emphasize at the outset that both components of the Commonwealth's economic theory of injury are supported by specific evidence in the record, not conjecture. First, specific evidence supports the fact that employers in Massachusetts are highly likely to take advantage of the expanded exemptions provided by the rules, and that as a consequence, women in Massachusetts will lose contraceptive coverage. The Department's regulatory impact analysis for the final rules calculates that, at a minimum, 70,515 women of childbearing age who are currently using an FDA-approved method of contraception nationwide will lose coverage. And after accounting for Massachusetts' share of the national population and excluding the Massachusetts women who are covered by Massachusetts' contraceptive equity law, that means that, at a minimum, we still have 829 women in Massachusetts who are likely to lose coverage. Importantly, that regulatory impact analysis accounted for a number of factors that would make the calculation conservative. So it only included 44.3% of women of childbearing age, based on data showing that in a given month, that percentage of women are likely to be using an effective method of contraception. But of course, if you expand that out over a bigger time horizon, like a year, for example, 80% of women are likely to use contraception. It also assumed that only 62% of employees working for employers are covered by employer-sponsored plans. And I'd also like to emphasize that the employers that were included in that calculation, specifically the litigating employers, are extremely likely to use the expanded exemptions, because through their conduct in the past that is suing to challenge the contraceptive mandate in court, they've evidenced a strong objection to the ACA's contraceptive mandate. So that data alone is sufficient to show a substantial risk of injury, that employers in Massachusetts are likely to drop coverage under these rules. I'm sorry, what do you mean by that data alone? Do you mean the litigating employees, or do you mean the proportional share argument? Or do you mean both, each? The litigating employees factors into the overall calculation. I would have thought you had an independent argument that given the existence of the litigating employees, employers within the Commonwealth, and that they hire more than one person each, that that might just standing up, pardon me, might alone give you standing. Yes, Your Honor, so we think that cinches the matter. If we didn't have the existence of litigating employers in the Commonwealth, we would still think we would have standing. But given the fact that we have two litigating employers, Hobby Lobby and AutoCam Medical, who sponsor self-insured plans that aren't covered by the Commonwealth's contraceptive equity law, we think standing just is, we've plainly met the substantial risk standard in this case. Is there any evidence in the record as to how many people they employ in the Commonwealth? There is evidence in the record on the number of people they employ nationwide, and we know that Hobby Lobby has four retail stores in Massachusetts, and the National Women's Law Center amicus brief cites data showing that AutoCam Medical employs at least 102 employees in Massachusetts. The department's data didn't break out the number of employees by state. But the existence of those employers, we think, makes it very likely that some employers in Massachusetts will use these expanded exemptions and that women will lose coverage as a result. Now, as to the second part of the Commonwealth's economic theory of standing, we have, again, specific evidence supporting the fact that some proportion of those employees will turn to the Commonwealth's state-funded sources to obtain replacement contraceptive care and services or services for prenatal care for unintended pregnancies. So we have declarations from MassHealth, the Department of Public Health, and the University of Massachusetts health care system explaining that the Commonwealth guarantees contraception for people with incomes of somewhere between 138% and 300% of the federal poverty level. And that means that for a woman with two children, a four-person family, she could have an income of up to $70,000 and still qualify for state-funded replacement contraceptive care. We have evidence from the Boyle Declaration, paragraph 4, that women in Massachusetts who have employer-sponsored plans, in fact, turn to these services. So MassHealth already covers care for 150,000 Massachusetts residents as a secondary payer. They provide wraparound insurance for residents with employer-sponsored plans. There's another declaration explaining that, on average, about a quarter of the women of childbearing age in Massachusetts who have an employer-sponsored plan will be eligible for these services through MassHealth or through the Department of Public Health. So again, that's precisely the kind of specific, concrete evidence that the Supreme Court in this court has said is sufficient to show a substantial risk of imminent injury under Article III. That makes this case different from cases like Clapper in which there wasn't evidence, it was based on conjecture. This case looks a lot more like the Monsanto case in which there were declarations supporting the standing of the conventional alfalfa farmers. Now, the Department's only real response is that the Commonwealth hasn't identified a particular woman who has lost coverage because of the rules. Every court to address that argument already, we have the Ninth Circuit and a district court in California and a district court in Pennsylvania, has rejected that argument, and for good reason. It's just simply inconsistent with the substantial risk standard. And I point your honors again to Monsanto, this court's decision in Berner that fleshed out what that standard looks like. And I'd also emphasize that this particular woman theory would force the Commonwealth to wait until it's already incurred likely significant economic harm before it could come to court and seek relief. The Commonwealth won't know until sometime that women have lost coverage because of the rules and are seeking state-funded sources because the rules don't require an employer to provide notice to the Commonwealth before dropping coverage. So the Commonwealth would likely be some time before we have that evidence. How would you know? Does not mass health itself track the number of requests for contraceptive coverage and alternatively prenatal? I believe it does track that, but it wouldn't be able to connect that to the woman's employer having dropped coverage because of these rules. If there were an increase, which is what you are predicting, how long would it take to get that data confirming there was an increase? I don't have a specific time estimate. We might see an increase over a period of a year or two years. The employers often drop coverage at the turn of the plan year, so you might expect that around I think it's often December, January, although they can drop coverage earlier than that. So the other thing is if you are predicting this harm in the form of mass health having to provide extra dollars for extra coverage, what about budget requests being made to the legislature? Is there any evidence on that? There is an evidence on that specifically. There is evidence in the declaration from Dr. Childs-Roshek that, so this isn't for mass health, this is for the clinics funded by DPH grants, that those clinics exhaust their allocation of grant money every year. And I think that would support an inference that if more women were seeking care from those clinics, it would put more pressure on the appropriations process. I would like to briefly address another basis for standing. So the Commonwealth also contends it has standing based on the denial of the opportunity to comment and on its quasi-sovereign interest in the health and well-being of its residents. I'm sorry, you did have that opportunity as to the final regs which are now in effect. I have a bit of a hard time understanding why that issue isn't moved. I'd point your honor to this court's decision in Levesque, which says that as a general matter, when a rule... So I assume you would probably amend your complaint and you would move for preliminary injunctive relief the way the litigation has been done in the Ninth Circuit and the Third Circuit. What could you possibly gain by pursuing the IFRs that you're not going to be gaining in your pursuit of the final rules? As for standing, we think it's sufficient to hold that the Commonwealth has standing based on the economic injury alone. We would amend the complaint, as your honor suggests, and we would likely maintain the procedural challenge based on the denial of the opportunity to comment on the rules, in addition to the substantive APA claim and the equal protection. You're not answering my question. Did you take advantage of the opportunity to comment on the final rules? Yes, your honor, we did. I'd just again point your honor to the Levesque case, which says even when an agency provides post-implementation opportunity to comment, that doesn't cure the initial defect in the rules. I'm still trying to understand what relief you could possibly be seeking as to the IFRs that isn't available to you from an attack on the final rules. The relief wouldn't be as to the IFRs. It would be in validating the final rules, and then the agencies could then file a notice of proposed rulemaking and go through the proper rulemaking process. That's the relief. But our principal basis for challenging the rules is that it's inconsistent with the Affordable Care Act and the Constitution. Thank you. Thank you. Ms. Yuan, good morning. Good morning. May it please the court, Karen Schoen on behalf of the federal government. Massachusetts contends that it will be injured by the challenged rules because residents will lose contraceptive coverage and seek state-funded services as a result. But the Commonwealth's claim of injury is too speculative to support standing here. And the fundamental problem is that Massachusetts has not shown a sufficient likelihood that employers will use the expanded exemption under the challenged rules to deprive residents of contraceptive coverage. Okay, let's start with Hobby Lobby and the auto... AutoCam, Your Honor. Yes. What does it sell, by the way, that company? Oh, I apologize, I don't remember what AutoCam does. And we know they've got at least a hundred for likely several hundred employees in the Commonwealth. Why would they behave differently in Massachusetts than they've behaved elsewhere? Well, the problem, Your Honor, is we don't know whether they will use the exemption rather than the accommodation. It's true they were one of the many for-profit entities along with Hobby Lobby that challenged the mandate initially. But it was as a result of Hobby Lobby's victory in the Supreme Court and its challenge to the mandate that the agencies made the accommodation available to Hobby Lobby and other closely held for-profit companies. And so there's nothing in the record that suggests they would use the exemption rather than the accommodation. And I think with respect to Hobby Lobby... Well, yes, given the logic of their argument, there certainly is an inference that they would prefer to use the exemptions. So if you're wrong about that and there is a likelihood that those employees are going to lose coverage and then turn to the state, is that sufficient from your point of view to establish standing? Well, I think the problem is there are additional layers of speculation. And I'd like to come back to the point about whether Hobby Lobby is likely to use it. But just assuming for the sake of argument to address your question that they are, I think that we still have to speculate in terms of the women themselves. Some women may agree with Hobby Lobby's decision. They may... Hobby Lobby, for example... I would imagine it would violate the employment laws if they said only people who share our religious beliefs can be hired here. So there's no explicit requirement that we know that they've imposed upon their employees. But we can only speculate that women will lose coverage of a method that they would otherwise choose. So Hobby Lobby may still continue to cover methods that their particular employees might choose. And those women may also have alternative access. They may have access through a spouse's plan, a parent's plan if we're talking about a young adult, or may be able to afford contraceptives on their own, out of pocket. And so we can only speculate. And I think this is... I just want to underscore a fundamental point, both with respect to the employers and with respect to the women. And I think what sets this case apart is that we have to speculate and make assumptions about what independent third parties are going to do. The employers at the threshold level, and then the women secondarily. And I think this... the Supreme Court has made clear in cases like Lujan and Clapper, for example, that for purposes of establishing standing, plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court. The court said it's the plaintiff's burden to provide facts showing that those choices have been made or will be made. And Massachusetts simply hasn't done that here. I think we can't just assume that an employer is going to use the exemption rather than the accommodation when there's no evidence in the record that suggests that Hobby Lobby or AutoCam or the other entity that the Commonwealth pointed out, Cummins Allison, which has been using the accommodation, objects to the accommodation. I think that's just too speculative here. We don't... we just don't know that Hobby Lobby has an objection to the accommodation. And nothing in the record suggests that they do. So... You don't think there's a substantial risk of this taking place? It doesn't have to be 100 percent sure. All that needs is substantial. You have a group of people that are receiving a benefit, and that's cut out, and there's another alternative to receive that benefit. You think that's speculation? I do, Your Honor. And again, because, you know, unlike some of the other cases that the Commonwealth has cited, this case relies on assumptions about choices made by independent third parties, and we just can't speculate and assume that those parties are going to make those decisions. And I think that's the key... The Supreme Court has, in several cases, including Monsanto, said that if there's a likely chain of causation, even if it involves third parties, that does not defeat standing. I mean, I know Clapper, of course he would rely on that, but it's a bit odd to think that no woman would be affected, and even odder to think that she wouldn't turn... I mean, contraception is a pretty important thing in a woman's life, that she wouldn't turn to find another source of funding for her preferred method. Right. And I understand that, and we certainly don't need to minimize that, but I think some employers recognize that, too. And so their decision to use the exemption, for example, rather than the accommodation, is not something they would enter into lightly. And I would, not to be a dead horse, but just to go back to Hobby Lobby for a moment, I think it is worth considering what the court said in Hobby Lobby with respect to the accommodation. And the court did not decide whether the accommodation complies with RIFA, quote, for purposes of all religious claims. But then the court went on to say, quote, At a minimum, however, it does not impinge on the plaintiffs, referring to Hobby Lobby's religious belief. And then the court in a footnote again noted, quote, that the accommodation, quote, And so I think, especially in light of the Supreme Court statements there, I think it is just too speculative to just assume that Hobby Lobby is not going to use the accommodation, but is going to use the exemption. Can I ask the status of the cases in our sister circuits? Yes, Your Honor. So the California District Court and the Pennsylvania District Court each enjoined the final rules, and both of those preliminary injunctions are up on appeal. Yes, and the Pennsylvania one is national. Therefore, the law has not come into effect in Massachusetts. The California one is restricted to only the plaintiff's estates, and Massachusetts is not one of them. All right. So when is oral argument in each circuit? The Third Circuit has scheduled oral argument from May 21st, I believe is the date. The Ninth Circuit has not yet set a date, but it said it would set it as soon as practicable following completion of briefing. And has the federal government filed its briefs in the Ninth Circuit? Yes, we filed our opening brief in the Ninth Circuit on February 25th. We are awaiting the state's response. I believe theirs is due April 15th. Okay, and those are mostly going to the merits of whether a preliminary injunction should have been issued? Yes, that's correct, Your Honor. So were this case remanded, it would strike me that the federal government would be in a very good position to quickly address the question of preliminary injunctive relief because you briefed it in two circuits now. I assume so, Your Honor. I mean, I guess it depends on the court and, you know, all the litigator schedules. But, yes, it would be something that I imagine we would address. Well, in a sense, Massachusetts has been deprived of the opportunity to get any hearing on preliminary injunctive relief out of the ruling that it didn't even have standing to pursue the claims. And there is some sense of if they are correct that they have standing, then it seems that those claims should be heard promptly. Whether they could prevail on those claims is certainly not an issue in front of us, but one ought to have a chance to make the case before injunctive relief comes in, before the law comes into effect in Massachusetts. We all agree on that. Assuming you believe that they have standing, yes, I think that is. Okay. I'm not sure if it's worth addressing the other issues. Let's assume that thinking about structures of decisions, they also make a parent's patriae standing claim. I take it it's really not necessary to resolve that claim if we agree with them that their fiscal injury claim suffices. That's correct, Your Honor. But in terms of that assertion of standing, we would argue that they cannot assert parent's patriae standing here against the federal government. And even if they could, separate and apart from that, they have not demonstrated an injury to their residence traceable to the final rules. Of course, if you agree that they have standing with respect to their economic injury, then there's no need to reach that question. Can we talk a little about their claim that they say is not moot as to the IFRs, the noncompliance with the APA is their argument about the interim rules. I take it your position is, yes, that's moot. The final rules mooted that out. Nothing can be gained by pursuing the IFR APA claims. That's correct, Your Honor. And I think if I understood the commonwealth correctly, I think they believe they have a new procedural challenge with respect to the final rules because they are somehow internally tainted. But that would not be mooted if... No. So to the extent, and I think the point I'd like to make, though, is that even to the extent they do continue to have a live procedural injury with respect to the final rules, that that procedural injury alone cannot be the basis for standing. Apart from that, they still have to show some substantive injury from the rules. So they don't need to show, for example, that the rules would have been any different had they been able to engage in the proper notice and comment. But they still have to show that the rules themselves injured them in some way. So your position is merely that the IFR procedural claims are moot, but if there are procedural claims they wish to make as to the final rules in an amended complaint, you're not taking the position that they're moot. You just say they don't go anywhere. That's exactly right, Your Honor. All right. If there are no further questions, then we respectfully ask that you affirm the judgment of the district court. Thank you. Thank you, Your Honor. I have two very quick points to make. The first is that the departments themselves have counted Hobby Lobby and AutoCam among the employers that are likely to drop coverage under the rules and use the expanded exemption. And the Ninth Circuit in the California v. Azar case counted Hobby Lobby among those employers, too. We think that's enough to make a substantial risk standard. The second point is that it's well established, as Judge Lynch mentioned, in the Berner and the Monsanto cases, that even where third-party action is part of the causal chain of injury, that that doesn't defeat standing. And whereas here we have specific evidence on each step in that causal chain, we think we have more than met the substantial risk of injury standard. Thank you, Your Honors. Thank you.